UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EILEEN M. MALAY,

                              Plaintiff,

                                                     5:08-CV-0599
v.                                                 (GHL)

CITY OF SYRACUSE, GARY W.
MIGUEL, DANIEL BELGRADER,
MICHAEL YAREMA, STEVE
LYNCH,

                              Defendants.
_____

APPEARANCES:                           OF COUNSEL:

O'HARA, O'CONNELL & CIOTOLI       FRANK S. GATTUSO, ESQ.
Counsel for Plaintiff
7207 East Genesee Street
Fayetteville, NY 13066-1262


MARY ANNE DOHERTY              JAMES P. MCGINTY, ESQ.
Corporation Counsel for the City of Syracuse
Counsel for Defendants
300 City Hall
Syracuse, NY 13202

GEORGE H. LOWE, United States Magistrate Judge


### MEMORANDUM DECISION AND ORDER[1]

       In this action, Plaintiff Eileen M. Malay contends that the City of Syracuse, Chief of

Police Gary W. Miguel, and officers Daniel Belgrader, Michael Yarema, and Steve Lynch

violated her rights under the federal constitution and New York state law when they fired military

_____

[1]      This matter is before the Court by consent of both parties.  (Dkt. No. 34.)

grade gas into her home during an armed standoff with her landlord, failed to provide her with medical care, and failed to decontaminate her property.  (Dkt. No. 23.)  Currently pending before the Court is Defendants' motion for summary judgment.  (Dkt. No. 40.)  Plaintiff has opposed the motion.  (Dkt. Nos 43, 45.)   For the reasons discussed below, Defendants' motion is granted.

## I.   FACTUAL HISTORY

In March 2007, Plaintiff lived in a first floor apartment at 303 Gere Avenue in Syracuse. (Dkt. No. 40-25 ¶ 1; Dkt. No. 45 ¶ 1.)  Plaintiff rented the apartment from Thach and Sopheap Ros, who owned and lived in the house of which the apartment was a part.  *Id*. ¶ 2.

On March 17, 2007, Thach Ros shot Sopheap Ros in the street.  *Id*. ¶ 4.  Neighbors heard the gunshots.  *Id*. ¶ 5.  After shooting his wife, Thach Ros returned to his house at 303 Gere Avenue.  *Id*. ¶ 4.  Three shots rang out inside the residence.  *Id*. ¶ 6.

At approximately 3:49 p.m., Syracuse Police Department personnel were dispatched to Gere Avenue.  *Id*. ¶ 3.  Several units responded to the scene.  *Id*. ¶ 7.  Police learned there were at least two children still inside 303 Gere Avenue with Thach Ros.  *Id*. ¶ 6.

Police heard screams from Thach Ros' daughter-in-law at the window of 303 Gere Avenue.  *Id*. ¶¶ 9, 12.   Police asked her where Thach Ros was.  *Id*. ¶ 10.  One of the officers on the scene noted in his report that the daughter-in-law responded that Thach Ros was "down[]stairs with a dead body."  (Briedis Report, Dkt. No. 40-3 at 2.)  Another officer noted in his report that the daughter-in-law responded that she did not know where Thach Ros was. (Gilbertsen Report, Dkt. No. 40-4 at 2.)  Police evacuated the daughter-in-law and two of Thach Ros' children from the roof with a ladder.  (Dkt. No. 40-25 ¶¶ 11-12; Dkt. No. 45 ¶¶ 11-12.)

After the evacuation of the daughter-in-law and the two children, Thach Ros remained in

2

the house with his son, Peter.  Defendants assert that the "police were informed that the shooter

had shot his son, but it was uncertain whether the son was dead or alive." (Dkt. No. 40-25 ¶ 13.)

Plaintiff, in opposition, states "that the evidence illustrates that the police were nearly certain that

the son was in fact dead." (Dkt. No. 45 ¶ 13.)

As support for their assertion that the police were "uncertain" about whether Peter was

dead or alive, Defendants cite a report filed by Officer Bodah. (Dkt. No. 40-25 ¶ 13.) Officer

Bodah interviewed the eleven year old boy who had been evacuated from the house. (Dkt. No.

40-2 at 2.) The boy told Officer Bodah that he had seen his father, Thach Ros, shoot his brother,

Peter, in the head with a rifle. *Id*.  The boy saw Peter bleeding from the head and he believed that

Peter was dead. *Id*.

In support of her assertion that the police were "nearly certain" that Peter was dead,

Plaintiff cites the reports of Officers Otis and Briedis.[2] (Dkt. No. 45 ¶ 13.) Officer Otis wrote in

her report that "[o]fficers on the scene" learned from Thach Ros' daughter-in-law, Chanmakara,

that Thach Ros had shot Peter in the head and that "the gunshot wound Peter sustained was lethal

and thus he was dead." (Dkt. No. 40-6 at 2.) As discussed above, Officer Briedis reported that

Chanmakara Ros said that Thach Ros was "down[]stairs with a dead body." (Dkt. No. 40-3 at 2.)

Defendants have not cited any evidence supporting their assertion that it was "uncertain"

whether Peter was dead or alive.  Plaintiff's evidence supports her assertion that the police were

"nearly certain" that Peter was dead.  Therefore, I will assume for the purposes of this motion that

the police were "nearly certain" that Peter was dead.

---

[2]        Plaintiff also cites the deposition of Defendant Officer Yarema, but none of the
parties has provided the Court with the pages cited by Plaintiff.

Defendants cite the report of Officer Rathbun (Dkt. No. 40-7) for the proposition that Thach Ros "was reportedly armed with a rifle and had unrestricted freedom of movement throughout 303 Gere Avenue.  Police were aware that there was an attached apartment to the property; however it was unclear if the suspect could gain access to the apartment.  The tenant of the apartment could not be located."  (Dkt. 40-25 ¶¶ 14-15.)  Officer Rathbun's report does not say that Plaintiff "could not be located."  Rather, it states that Plaintiff "had not been located."  (Dkt. No. 40-7 at 2.)

Defendants cite the deposition of Defendant Lynch (Dkt. No. 40-15 at 19-20) for the proposition that "[i]t was ordered that reverse 911 calls be made in an attempt to obtain a phone number for Plaintiff's apartment.  Defendant Lynch then instructed the 911 Center to call the number associated with Plaintiff's apartment."  (Dkt. No.40-25 ¶ 16.)  Plaintiff disputes the assertion that the request for reverse 911 calls was made "in an attempt to obtain a phone number for Plaintiff's apartment."  (Dkt. No. 40-25 ¶ 16.)  Plaintiff is correct.  Defendant Lynch testified that he "was provided a number some time during the incident regarding a Malay . . . A number for Jubal Malay[3], and I believe I had the 911 Center call that number."  (Dkt. No. 40-15 at 19:10-16.)  It is undisputed that the land line associated with Plaintiff's apartment was dedicated to an Internet connection and there was no telephone attached.  (Dkt. No. 40-25 ¶ 17; Dkt. No. 45 ¶ 17.)  At the time of his deposition, Defendant Lynch could not recall whether he ever informed his superior officers that he had been unable to reach anyone at the number he had been provided for Jubal Malay.  (Lynch Dep., Dkt. No. 40-15 at 25:9-23.)

Defendants cite the deposition of Defendant Miguel (Dkt. No. 40-12 at 38) for the

---

[3]        Jubal Malay is Plaintiff's son, who lived with her at the time of the incident.

4

proposition that "[n]egotiators from the police department continuously used a bullhorn to try and contact the occupant(s) of the residence." (Dkt. No. 40-25 ¶ 18.)  In the page of the deposition cited by Defendants, Defendant Miguel testified that "we had the bullhorn in regards to trying to get the suspect out of the house."  (Dkt. No. 40-12 at 38:10-11.)  As Plaintiff notes (Dkt. No. 45 ¶ 18), the evidence regarding the bullhorn is far from clear.  Defendant Belgrader testified at his deposition that:

> A:      I was not with the negotiators.  They, I know, they were doing a lot of their
>
>         negotiating through a bullhorn . . .
>
> Q:      Did you personally use a bullhorn?
>
> A:      No.
>
> Q:      Do you recall who was using a bullhorn?
>
> A:      No.
>
> Q:      Do you recall how many times that bullhorn was used?
>
> A:      No.
>
> Q:      Do you know who they were directing the bullhorn towards, was it the subject, the
>
>         gunman or somebody else?
>
> A:      The gunman.
>
> Q:      Do you recall whether the bullhorn was used before or after gas was deployed?
>
> A:      Before.  I believe before and after.

(Dkt. No. 40-13 at 33:9-34:3.)

Defendant Yarema testified at his deposition:

> Q:      Do you recall whether there was a bullhorn present at the scene that day?

A:      I can't tell you if it was a bullhorn or if it was a PA, audible mike, but yes,

        someone was speaking over it.

Q:      A loudspeaker?

A:      Loudspeaker, yes.

Q:      Do you remember who that was?

A:      No.

Q:      Do you remember who they were speaking to, the subject or somebody else?

A:      Occupants of the dwelling.

Q:      Do you recall whether they ever called out the name of the tenant living in the

        adjacent apartment?

A:      I don't recall.

(Dkt. No. 40-14 at 36:13-37:4.)

        That afternoon, Plaintiff was at home in her apartment washing the kitchen floor, tidying

her house, and playing on her computer.  (Dkt. No. 40-10 at 14:11-17.)  Plaintiff had her

windows down and blinds closed.  The windows were also covered in plastic.  (Dkt. No. 40-25 ¶

22; Dkt. No. 45 ¶ 22.)  At one point, Plaintiff heard a voice say "Kids, get away from the man

with a gun."  (Dkt. No. 40-25 ¶ 21; Dkt. No. 45 ¶ 21.)  Plaintiff did not pay attention because

there was a group of youths in a house up the street from her house who "occasionally had yelling

arguments in the street" and she "kind of minded [her] own business" and "didn't go out in the

street or anything."  (Dkt. No. 40-10 at 14:24-15:7.)  She assumed that one of the youths had a

gun and that "somebody of authority was there dealing with it."  *Id*. at 15:13-16.  At about 4:00,

Plaintiff called her son, who was at his girlfriend's house, and told him to stay there because there

6

was "some kind of altercation going on up the street." *Id*. at 15:16-21; 31:15-18.  Rather than

running errands, Plaintiff decided to stay home and watch a movie she had borrowed from the

library. *Id*. at 16:2-4.

As Plaintiff sat in her living room watching the movie, she smelled gun residue coming

from the east side of the house.  (Dkt. No. 40-25 ¶ 23; Dkt. No. 45 ¶ 23.)  Defendants cite a

portion of Plaintiff's 50-H hearing testimony for the proposition that "Plaintiff heard gunshots in

the street and knew the police were there."  (Dkt. No. 40-25 ¶ 24.)  In the cited portion of

testimony, Plaintiff stated that "I heard a man's voice yell, he went that way, and I called my son,

and I told him, I think I - I heard gunshots on the street, and I think the police or somebody's here.

It sounded like that kind of authoritative voice.  And I think they just chased somebody around

the house, up the street.  I thought it was still up the south side of the street, and they chased

somebody from that house up to the north and then to the west side of the house . . . . " (Dkt. No.

40-10 at 16:19-17:4.)  As Plaintiff correctly notes (Dkt. No. 45 ¶ 24), this testimony does not

establish that Plaintiff "knew the police were there."  Rather, it establishes that she *thought* that

the police "or somebody" was on her street.

Then "it got really quiet" and Plaintiff "didn't hear neighbors or sirens or anything."  (Dkt.

No. 40-10 at 17:19-21.)  Plaintiff looked out her door and "could see at the end of the street there

was a police car . . . " (Dkt. No. 40-10 at 18:4-6.)  Plaintiff also noticed a ladder.  *Id*. at 26:16-19.

Plaintiff assumed that "[e]verything is under control.  It's quiet.  It's probably all taken care of."

*Id*. at 18:9-10.  She decided to keep watching her movie and stay in the house the rest of the

night.  *Id*. at 18:7-11.

At approximately 6:20 p.m. CS and OC gas were deployed into the residence, including

Plaintiff's apartment.  (Rathbun Report, Dkt. No. 40-7.)  The officers involved in the decision to deploy gas were Defendant Sergeant Michael Yarema, Defendant Sergeant Daniel Belgrader, Lt. Mike Glavin, and the "Chiefs of Police."  (Yarema Dep., Dkt. No. 40-14 at 23:2-13.)   When the gas was deployed, Plaintiff's living room windows "exploded" and it "sounded like a shotgun blast."  (Dkt. No. 40-10 at 16:10-14.)  Plaintiff ran into her bedroom and hid in her closet.  (Dkt. No. 40-10 at 19:3-8.)  From there, she heard her son's bedroom windows explode.  *Id*. at 19:8-9. She believed it was a drive-by shooting.  *Id*. at 19:9-12.  Worried that she was not safe in her bedroom, where there were windows, she ran into her kitchen and hid behind the refrigerator.  *Id*. at 19:17-24.  She had just grabbed her cell phone off the top of the refrigerator, where it was charging, when the windows on the north side of the kitchen exploded.  *Id*. at 20:2-8.  Plaintiff ran down the basement stairs.  *Id*. at 20:13-14.  When she got to the bottom of the stairs, she started to cough and then realized that "the place is filling up with gas of some kind, and it's getting hard to see, and I can't breath[e]."  *Id*. at 20:15-18.

Plaintiff called 911.  *Id*. at 20:18-19.  The 911 operator connected Plaintiff to Officer Kevin Birardi.  *Id*. at 21:3-5.  Officer Birardi asked Plaintiff where the door to her apartment was. She told him that it was next to her car, on the north side of the house.  Her car was parked three feet from the north side of the house.  (Dkt. No. 40-10 at 21:5-9.)  Officer Birardi told Plaintiff "we can't come to you.  Can you see to make it out of the house?" and instructed Plaintiff to wait until the police told her to come out.  *Id*. at 21:14-18.  Plaintiff went upstairs and then the police pounded on the door and told her to come out.  *Id*. at 22:5-9.  Plaintiff opened the door to find "a bunch of guys with black outfits on."  *Id*. at 22:9-11.  Plaintiff ran out into the street, intending to go across the street to the home of Shannon and Ra Ros, the son and daughter-in-law of Thach

Ros.  *Id*. at 22:19-22.  When she got to the middle of the street, she turned around and saw that the police were still gathered around her door.  They were dressed in black gear and had large shields that they were using to protect themselves from something upstairs in the apartment.  *Id*. at 22:11-17.  An officer yelled "no, no don't run that way.  Run towards the van."  *Id*. at 22:18-19. Plaintiff saw a van parked at the end of Gere Avenue and ran to it, by herself.  *Id*. at 23:2-24. According to Plaintiff, about twenty minutes elapsed from the time her living room windows exploded to the time she ran outside.  *Id*. at 24:11-17.

When Plaintiff was in the van, she asked the officers if they had gotten Thach Ros' children out of the house.  *Id.* at 25:16-25.  One of the officers said that they had, but that Peter was still in the house and "we don't know if he's dead or alive, so we need you to help us right now."  *Id*. at 26:1-4.  Someone said that an EMT should look at her, but one of the SWAT team members said "no, I really need her to diagram the house right now."  *Id*. at 25:11-15.  Plaintiff diagramed her apartment and what she knew of the Ros' apartment next door.  *Id*. at 27:23-25. When she was done, the officers asked her to stay around in case they needed her.  *Id*. at 28:6-10. The police took her outside to a parked car, where Officer Birardi sat with her.  *Id*. at 28:19-25. Officer Birardi asked Plaintiff whether she needed medical attention and she said no.  (Dkt. No. 40-17 at 14:16-18.)  Plaintiff asked why the police were still shooting at the house and Officer Birardi told her that they were trying to find out whether Peter was still alive.  (Dkt. No. 40-10 at 28:25-29:2.)  Plaintiff asked Officer Birardi if she could get her car.  *Id.* at 29:7.  He said that she could not because it was near the house, and that a Hazmat team would have to clean out her belongings and that she might lose a lot of it because they would not be able to clean all of it.  *Id*. at 29:13-17.  An officer asked Plaintiff if she wanted pizza.  *Id*. at 20-22.  She asked for water

9

and an officer brought her a bottle of water.  *Id*. at 29:23-24.

At about 9:00 p.m., Plaintiff asked to use the bathroom.  *Id*. at 30:8-10.  Officer Birardi went to ask where Plaintiff could use the bathroom, and when he returned he told her that she could leave and that the police did not need her anymore.  *Id*. at 30:9-15.  Plaintiff called her son, who agreed to pick her up at a pizza shop.  Officer Birardi walked her to the shop.  *Id.* at 31:2-9.

Plaintiff's son drove Plaintiff to her sister's house, where Plaintiff spent the night on the couch without taking a shower or changing her clothes.  *Id*. at 31:21-32:13.  Plaintiff was sick all night: her face and hands were burning, there was a heavy metallic taste in her mouth, and she was coughing.  *Id*. at 32:14-17.  The next day, Plaintiff's sister took her to buy some clothes to change into.  (Dkt. No. 40-10 at 32:19-25.)

On Monday, Plaintiff returned to her apartment to try to retrieve her car.  An officer on the scene told her she would have to call Sgt. Linnertz.  *Id*. at 34:10-20.  Plaintiff called Sgt. Linnertz and he said he did not know whether or not she could take her car, but that he would try to find out for her.  *Id*. at 34:20-22.  On Tuesday, Plaintiff was allowed to take her car.  *Id*. at 35:4-6.

When Plaintiff drove the car, it made her sicker.  (Dkt. No. 40-10 at 35:16-17.)  On Wednesday, March 21, she called Lt. Joe Cecile, who said that an officer would come to tow the car to be cleaned.  He asked Plaintiff to wait until the officer arrived.  She stated that she would, but that as soon as he got there she needed to go the emergency room because she had been getting sicker since Saturday.  Officer Rusty Jones towed Plaintiff's car and then drove her to the emergency room at St. Joseph's.  *Id*. at 35:20-36:12.  Officer Jones stayed with Plaintiff in the emergency room.  When Plaintiff told the person doing intake that she was there because she had

breathed in tear gas, Officer Jones said "It wasn't tear gas.  It was CS gas."  *Id*. at 36:13-18.

Plaintiff stayed at the hospital until 6:00 p.m., when she was picked up by Officer Staley. *Id*. at 37:9-11.  He gave Plaintiff a check from the Syracuse Police Department for $1,000.  (Dkt. No. 40-10 at 37:20-38:11; Dkt. No. 40-25 ¶ 26; Dkt. No. 45 ¶ 26.)

In early April, Plaintiff went to see Dr. Julie Colvin because she was extremely dizzy, her arms and hands kept going numb, the skin on her hands and face kept burning, she constantly had a metallic taste in her mouth, she was depressed, and she was having uncontrollable crying jags. (Dkt. No. 40-10 at 42:5-43:1.)

At some point, Plaintiff called Lt. Cecile to get information about the CS gas so that she could give it to her doctor.  (Dkt. No. 40-10 at 43:23-25.)  Lt. Cecile ultimately told her that he could not give her the MSDS sheets about the gas because "[t]his had become a legal matter" and therefore Plaintiff would need to contact the corporation counsel's office.  *Id*. at 45:1-4.  The corporation counsel's office faxed the sheets to Dr. Colvin.  *Id*. at 45:6-10.

In addition to seeing Dr. Colvin, Plaintiff saw Dr. Michael Lax in April.  (Dkt. No. 40-10 at 46:10-25.)  Dr. Lax, like Dr. Colvin, was not familiar with CS gas.  He did not know anyone in Syracuse who was.  *Id*. at 47:8-13.  He gave Plaintiff an inhaler and said she should be monitored to see if her issues worsened.  *Id*. at 47:14-21.

Plaintiff left her house with her purse, her winter coat, and the clothes she was wearing. She eventually had to throw away the coat, the purse, and her boots because they were contaminated.  (Dkt. No. 40-10 at 33:3-17.)  Plaintiff's car was ultimately totaled due to contamination.  (Dkt. No. 40-10 at 53:5-21.)  Plaintiff was never allowed to go back into her apartment, and as a result of the contamination she lost everything she owned.  (Dkt. No. 40-10

at 60:18-25.)

## II.    LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material[4] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).

---

[4]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

III.    ANALYSIS

    A.    **Claims Regarding the Decision to Deploy Gas**

        1.    <u>Claims Against Defendants Belgrader, Yarema, and Lynch</u>

Plaintiff claims that Defendants Belgrader, Yarema, and Lynch violated her constitutional rights when they "collectively acted to carry out a substantial gas assault on [her] home involving dozens of canisters of gas fired into and exploding inside [her] home while she peacefully occupied it." (Dkt. No. 23 ¶ 50.)  Defendants move for summary judgment dismissing this claim.  (Dkt. No. 40-24 at 6-8.)  For the reasons discussed below, Defendants' motion is granted regarding this claim.

The operative complaint alleges that the decision to deploy gas violated Plaintiff's "rights, privileges and immunities under the fourth and fourteenth amendments of the United States Constitution . . ." (Dkt. No. 23 ¶ 50.)  In his decision denying Defendants' motion to dismiss Plaintiff's claim regarding the deployment of gas, Judge McCurn stated that:

> Defendants' use of CS gas on Plaintiff's residence may be deemed covered by the Fourth Amendment.  <u>See</u> <u>LaLonde v. County of Riverside</u>, 204 F.3d 947, 960-61 (9th Cir. 2000) (Intentional exposure to toxic substances is an application of physical force for Fourth Amendment purposes).  Accordingly, Defendants will be liable if their use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to [their] underlying intent or motivation." <u>Jones v. Parmley</u>, 465 F.3d 46, 61 (2d. Cir. 2006).

(Dkt. No. 17 at 14-15.)

In light of that language, the parties briefed this issue on summary judgment as if the Fourth Amendment standard applies.  (Dkt. No. 40-24 at 6-8; Dkt. No. 43 at 1-5; Dkt. No. 48-1

13

at 1.)  After conducting initial research on this case, however, the Court requested and received

further argument and briefing from the parties on whether the Fourth or Fourteenth Amendment

applies to this case.  (Dkt. Nos. 49, 51, 53-54.)  Having reviewed the parties' arguments, the

Court concludes that the Due Process Clause of the Fourteenth Amendment governs Plaintiff's

claims regarding the decision to deploy gas.

        The Fourth Amendment prohibits unreasonable seizures.  A seizure occurs "only when

there is a governmental termination of freedom of movement *through means intentionally*

*applied*," in other words,  where a person is "stopped by the very instrumentality set in motion or

put in place to achieve that result."  *Brower v. C'nty of Inyo*, 489 U.S. 593 596-97, 599 (1989)

(emphasis in original).  Determining whether a "seizure" occurred is relatively simple in the usual

excessive force case where the police encounter a suspect, apply force directly to him with the

intent to immobilize him, and the suspect is immobilized by that force.  In *LaLonde*, for example,

the "seizure" issue was simple because the officers, in attempt an to immobilize a suspect,

applied pepper spray directly to the suspect and the suspect was immobilized by the pepper spray.

        The seizure issue becomes more complicated where (1) officers immobilize an individual

through means intentionally applied to that person, but are mistaken about the person's identity;

(2) officers intend to immobilize an individual and are not mistaken about the person's identity,

but the person is stopped by something other than the force used by the officers; or (3) a

bystander is injured by the force that officers are applying to a suspect.  The Supreme Court has

addressed two of these three situations.

        Regarding the first category, the Supreme Court has held that where officers use force on

an innocent person in the belief that the person is a suspect for whom they are searching, the

14

innocent person is "seized" within the meaning of the Fourth Amendment. *Hill v. California*, 401 U.S. 797 (1971).[5]

Regarding the second category, the Supreme Court has held that no seizure occurs where a suspect is injured by something other than the force applied by the officers. *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (no seizure where suspect on motorcycle fleeing police cars lost control and crashed because suspect was not injured by "means intentionally applied" by the police).

The case here falls into the third category because the officers intended to gas Plaintiff's landlord, but did not intend to gas Plaintiff. The Supreme Court has not addressed the third category. Several Courts of Appeals, however, have. One common context for this third category of cases is where a hostage is injured during an attempt to immobilize a hostage-taker. The Second Circuit considered this issue in *Medeiros v. O'Connell*, 150 F.3d 164 (1998).

In *Medeiros*, an escaping armed robber jumped into a school van and held the driver and

---

[5]       In *Hill*, police were investigating an armed robbery committed by four men. Officers located two of the men driving a car registered to a man named Hill. The car contained property stolen in the robbery. One of the men told the officers where Hill lived, and stated that the guns used in the robbery were in Hill's apartment. The officers checked Hill's official records and verified  his age and physical description, his address, and the make of his car. The officers went to Hill's apartment and knocked. A man matching Hill's description answered the door and the officers placed him under arrest. The officers asked him whether he was Hill and where the guns were. The man said that his name was Miller, that he was waiting for Hill, and that he did not know anything about any guns. The man produced identification showing that his name was Miller. The police were "unimpressed" and searched the apartment for two hours, finding weapons and stolen property. Hill was eventually arrested and found guilty. He appealed to the Supreme Court, arguing that the officers violated the Fourth Amendment. The Supreme Court affirmed the conviction, finding that the officers acted reasonably under the circumstances. Although the Court did not say so explicitly, this holding demonstrated that Miller had been "seized" despite the fact that the officers intended to seize Hill, not Miller, because the detention itself was willful.

two passengers hostage.  Troopers, who knew that there were passengers in the van,  were instructed to use force if necessary to arrest the robber.  The troopers shot the robber dead, wounding one of the passengers in the process.  The passenger ultimately died and his mother sued the troopers, claiming that they violated the passenger's Fourth and Fourteenth Amendment rights.  The district court granted the troopers' motion for summary judgment of the Fourth Amendment claim, finding that the passenger had not been "seized."

On appeal, the passenger's mother argued that the troopers "seized" the passenger because "they intentionally used their weapons."  *Id*. at 168.  Thus, she argued, there had been "a governmental termination of the passenger's freedom of movement through means intentionally applied" within the meaning of  *Brower.*  The troopers argued that they were not liable because although they "fully intended to seize" the robber, they "indisputably had no intention to curtail" the passenger's "freedom of movement."  *Id*.  They argued, essentially, that the *Brower* Court intended to say that a seizure occurs only when there is "a governmental termination of freedom of movement through means intentionally applied *to that person*."

The Second Circuit agreed with the troopers, holding that the passenger "was never seized within the meaning of the Fourth Amendment.  The Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct."  *Id*. (citation and punctuation omitted).  The court stated that "*Brower* does not mean . . . that a seizure occurs just so long as the act of restraint itself is intended . . . though it restrains one not intended to be restrained."  *Id*.  The Second Circuit distinguished *Hill,* the mistaken identity case, because there "the victim was indeed the object of an intentional act of seizure, even if the police were mistaken as to the victim's identity."  *Id*. at 169.

16

The other Courts of Appeals that have addressed the issue have reached the same conclusion.  *See Claybrook v. Birchwell,* 199 F.3d 350, (6th Cir. 2000) ("the Fourth Amendment does not apply to Section 1983 claims which seek remuneration for physical injuries inadvertently inflicted upon an innocent third party by police officers' use of force while attempting to seize a perpetrator, because the authorities could not 'seize' any person other than one who was a deliberate object of their exertion of force") (citing *Brower)*; *Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000);  *Rucker v. Harford C'nty*, 946 F.2d 278 (4th Cir. 1991), *cert. denied*, 502 U.S. 1097 (1992); *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 794-96 (1st Cir. 1990).

 Here, Plaintiff was not injured by force that was deliberately applied to her.  The parties' dispute centers on whether the officers *should have been* aware that Plaintiff was in the house and taken steps to remove her before they deployed the gas.  The parties all agree that the officers *did not know* that she was in the house and that they did not intend to gas her.  Rather, they intended to immobilize her landlord.  Accordingly, based on the consensus in the published cases of the Courts of Appeals, it seems clear that Plaintiff was not "seized."

"[W]here no seizure within the meaning of the Fourth Amendment has taken place, substantive due process analysis is appropriate."  *Medeiros*, 150 F.3d at 169 (citing *County of Sacramento v. Lewis*, 523 U.S. at 843.)  Substantive due process is violated only where government conduct "shocks the conscience."[6]  *Lewis*, 523 U.S. at 846-47.  Thus, the issue here is whether a reasonable juror could find that the officers' decision to deploy gas "shocks the

---

[6]     As discussed below, the exception to this rule is in the context of medical care, where officials violate substantive due process if they are "deliberately indifferent."

conscience."

The "constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Lewis*, 523 U.S. at 848.  Mere negligence is "categorically beneath the threshold of constitutional due process."  *Id*. at 849.  Rather, it is conduct "at the other end of the culpability spectrum" - conduct that is "intended to injure in some way unjustifiable by any government interest" - that is "most likely to rise to the conscience-shocking level."  *Id.*  In the law enforcement context:

> [P]olice on an occasion calling for fast action have obligations that tend to tug against each other.  Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs.  They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance . . . To recognize a substantive due process violation in these circumstances when only midlevel fault has been shown would be to forget that liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations.  When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.  But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates [substantive due process].

*Lewis*, 523 U.S. at 853.  Mindful of these considerations, the Supreme Court has held as a matter of law that it does not "shock the conscience" when a passenger is killed as the result of a high-speed police chase conducted with no intent to physically harm the suspect.  *Lewis*, 523 U.S. at 855.  Similarly, the *Madeiros* court, citing *Lewis*,  found, as a matter of law, that the "heroic and selfless conduct of the troopers . . . is the very opposite of conduct that could be said to shock the

18

conscience . . . The conduct of the troopers was not merely constitutionally acceptable, it was objectively admirable." *Madeiros*, 150 F.3d at 170.

Here, the officers were faced with a crisis.  Thach Ros had shot his wife in the street and retreated, armed, back into his home.  There, he shot and killed his son.  The police, although nearly certain that Peter was dead and probably no longer in need of protection, did not know whether Thach Ros would escalate the stand-off in some manner, for instance by beginning to fire indiscriminately into the street.  They needed to act quickly and decisively to restore order. The parties agree that the officers were not subjectively aware that Plaintiff was in the house.  On these facts, no reasonable juror could find that the officers' decision to deploy gas to immobilize Thach Ros "shocks the conscience."  Therefore, the motion for summary judgment dismissing this claim against Defendants Belgrader, Yarema, and Lynch is granted.

> 2.    Supervisory Liability Claim Against Defendant Miguel for Decision to Deploy Gas

Plaintiff claims that Defendant Miguel violated her constitutional rights by "directly participating in the event and in supervising subordinate officers . . . at the scene that commenced the gas assault on Plaintiff's home . . ."  (Dkt. No. 23 ¶ 48.)  As discussed above, Defendants Belgrader, Yarema, and Lynch are not liable for commencing the gas assault on Plaintiff's home. Therefore, for the same reasons applicable to the subordinate officers, Defendants' motion for summary judgment dismissing this claim against Defendant Miguel is granted.

> 3.    Claim Against City Regarding the Decision to Deploy Gas

Plaintiff alleges that the City of Syracuse violated her constitutional rights when its officers deployed gas into her home.  (Dkt. No. 23 ¶¶ 39-44.)  Defendants move for summary

judgment dismissing this claim.  (Dkt. No. 40-24 at 8-12.)

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), municipalities may

be sued for constitutional deprivations inflicted upon private individuals pursuant to a

governmental custom, policy, ordinance, regulation, or decision.  "[T]o hold a [municipality]

liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to . . .

prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected

to (3) a denial of a constitutional right."  *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).

Here, as discussed above, the decision to deploy gas did not deny Plaintiff her constitutional right

to substantive due process because it did not "shock the conscience."  Therefore, the claim

against the City regarding the decision to deploy gas is dismissed.

**B.**      **Claims Regarding the Failure to Provide Medical Care**

1.      <u>Medical Care Claims Against Defendants Belgrader, Yarema, and Lynch</u>

Plaintiff claims that Defendants Belgrader, Yarema, and Lynch violated her constitutional

rights when they "failed to provide necessary medical assistance to the plaintiff and failed to

instruct her to immediately seek necessary medical assistance, causing a lasting exposure to toxic

gas that led to severe injuries and emotional harm."  (Dkt. No. 23 ¶ 50.)  Defendants move for

summary judgment dismissing this claim.  (Dkt. No. 40-24 at 12-13.)

After an initial review of the pleadings and briefs, the Court requested further briefing

and argument from the parties regarding this claim.  Specifically, the Court asked the parties to

state whether Plaintiff "claims or has evidence that any individual Defendant (as opposed to the

City) was personally involved with the alleged failure to provide her with medical care."  (Dkt.

No. 49 at 1.)  At oral argument on June 21, 2011, Plaintiff's counsel advised the Court that

Plaintiff's claim regarding medical care was asserted solely against Defendant Miguel and the City. Therefore, to the extent that Plaintiff's complaint alleges that Defendants Belgrader, Yarema, and Lynch violated Plaintiff's constitutional rights by failing to provide her with medical care, Defendants' motion for summary judgment is granted and the claim is dismissed.

2.    <u>Medical Care Claims Against Defendant Miguel</u>

Plaintiff claims that Defendant Miguel violated her constitutional rights when he "[f]ailed to instruct the police officers to obtain medical attention for the Plaintiff" and when he "[f]ailed to instruct the Plaintiff to seek medical attention." (Dkt. No. 23 ¶ 47.) Defendants move for summary judgment of this claim. (Dkt. No. 40-24 at 13.)

The parties' briefs do not address in any meaningful way what legal standard should apply to Plaintiff's medical care claim. In their opening brief, Defendants do not set forth a standard or apply any authority to the medical care claim. Rather, Defendants merely state that they are not liable because "there were ambulances and medical personnel in the immediate vicinity [yet] [P]laintiff testified that she never requested medical attention nor, when it was offered, did she ever choose to avail herself of it." (Dkt. No. 40-24 at 13.) In opposition, Plaintiff does not set forth a standard or apply any authority to the medical care claim. Rather, she argues the facts of the case in a manner suggesting that the Court should apply a negligence analysis. Plaintiff argues that "it *would have been reasonable* for the officers to offer Plaintiff water to wash off with, *reasonable* to ask EMT to check Plaintiff, and *reasonable* to offer Plaintiff a change of clothes." (Dkt. No. 43 at 13, emphasis in original.) In reply, Defendants argue that the Court should employ a substantive due process analysis using the "shocks the conscience" test. (Dkt. No. 48-1 at 6-7.)

21

As discussed above, the standard generally applied in substantive due process cases is that a state actor violates the Constitution when his actions "shock the conscience."  However, courts have held that a different standard applies to some claims regarding the failure to provide medical care.  In cases considering the medical rights of pretrial detainees and arrestees, courts apply the "deliberate indifference" test.  *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239 (1983); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (holding that deliberate indifference standard applies to pretrial detainee's due process claim regarding denial of medical care); *Rasmussen v. City of New York*, 766 F. Supp. 2d. 399 (E.D.N.Y. 2011) (analyzing arrestee's claim that officers denied her medical care under Due Process Clause, using deliberate indifference test).  This slightly lower constitutional standard is applied in medical cases because

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes on it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – *e.g.* food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the . . . Due Process Clause.

*DeShaney v. Winnebago Cnty. Dept. of Social Servs.*, 489 U.S. 189, 199 (1989).

Plaintiff's claim does not fit neatly into this line of cases because Plaintiff was not a pretrial detainee or an arrestee.  Although Plaintiff remained on the scene for approximately two and a half hours after she was evacuated from her home, the officers did not take her into custody or hold her against her will in any traditional sense.  However, the Court finds that applying the deliberate indifference standard is appropriate in this case because the policy concerns underlying the pretrial detainee/arrestee cases are applicable here.  *See Lewis*, 523 U.S. at 851 (The

22

deliberate indifference standard "is sensibly employed . . . when actual deliberation is practical."). Therefore, Defendant Miguel will be liable if he was deliberately indifferent.

There are two elements to a plaintiff's claim that an official violated her right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant . . . official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996), *cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Here, there is certainly an argument that exposure to CS gas is "serious." However, Defendant Miguel testified at his deposition that "[d]ifferent people react differently to gas . . . There [are] some people that have a dramatic effect to gas, there [are] some people that have no effect at all." *Id*. at 67:6-14. There is no evidence in the record that Plaintiff was in any serious physical distress in the hours immediately following her evacuation from the house. At the time she was evacuated, Plaintiff was coughing and there was a burning sensation in her eyes, face, and hands. (Dkt. No. 40-11 at 35:1-15.) By the time she was diagraming her apartment for the police, her eyes were burning but not watering. *Id*. at 43:6-9. Although Plaintiff has suffered from health problems in the years after her exposure to the CS gas, there is no evidence that she was suffering

from a "serious medical condition" at the time that she was interacting with the police following her evacuation from her home.

Whether or not Plaintiff suffered from a "serious medical condition," the undisputed evidence shows that Defendant Miguel was not deliberately indifferent.  Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d, 698, 703 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Thus, to establish deliberate indifference, a plaintiff must prove that the official was aware of facts from which the inference could be drawn that the plaintiff had a serious medical need and that the official actually drew that inference.  *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-703. The plaintiff then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need.  *Farmer*, 511 U.S. 825, 835; *Ross v. Giambruno*, 112 F.3d 505 (2d Cir. 1997).

Here, there is no evidence that Defendant Miguel actually drew the inference that Plaintiff had a serious medical need or that he consciously disregarded or ignored the need.  Defendant Miguel saw Plaintiff very briefly sometime after she was evacuated from her house, but does not recall talking to her.  (Dkt. No. 40-12 at 61:24-64:8.)  City policy is to offer medical attention if "the officer observes that [an individual] needs medical attention or if he did not observe that then it would have to be something [the individual] verbalizes." *Id*. at 66:11-19.  Plaintiff "seemed perfectly normal" when Defendant Miguel saw her.  *Id*. at 65:3-6.  As to Plaintiff's claim that Defendant Miguel should have instructed his officers to obtain medical attention for Plaintiff, it is undisputed that Officer Birardi asked Plaintiff whether she needed medical

attention , that she said no, and that Plaintiff did not ask any other officer for medical attention.[7]

(Dkt. No. 40-17 at 14:16-18; Dkt. No. 40-11 at 41:3-12, 46:1-3, 48:2-5.)  Therefore, Plaintiff's

claim that Defendant Miguel violated her constitutional rights by failing to provide her with

medical care is dismissed.

3.    Medical Care Claims Against the City

Plaintiff claims that the City violated her constitutional rights by failing to provide her

with medical care.[8] (Dkt. No. 23 ¶ 39-43.)

As discussed above, "to hold a [municipality] liable under § 1983 for the unconstitutional

actions of its employees, a plaintiff is required to . . . prove three elements: (1) an official policy

or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."

*Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  An "official policy or custom" can be

shown in several ways: (1) a formal policy officially endorsed by the municipality; (2) actions

taken by government officials responsible for establishing municipal policies related to the

particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a

custom or usage sufficient to impute constructive knowledge of the practice to policymaking

officials; and (4) a failure by policymakers to train or supervise subordinates to such an extent

that it amounts to deliberate indifference to the rights of those who come in contact with the

---

[7]    The Court specifically allowed Defendants to file an amended statement of
material facts (Dkt. No. 50) and Plaintiff an opportunity to respond to that statement in order to
determine whether it was, in fact, undisputed that Plaintiff refused an offer of medical treatment.
Plaintiff never responded to the amended statement of material facts, so the Court concludes that
the fact is undisputed.

[8]    The Court notes that the City can be liable even if individual named defendants
are not.  *Barrett v. Orange C'nty Human Rights Commission*, 194 F.3d 341 (2d Cir. 1999).

municipal employees.  *Dorsett-Felicelli v. C'nty of Clinton*, 371 F. Supp. 2d 183, 194 (N.D.N.Y. 2005) (citing *Monell*, 436 U.S at 690, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986), and *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Plaintiff claims that three of these four ways apply here.  Specifically, she alleges that the City "failed to provide a protocol for providing medical assistance to innocent civilians exposed to gas," that Defendant Miguel acted as "the final policy maker with regard to the use of gas," and that the City "failed to train Syracuse City police officers to instruct innocent civilians that are exposed to gas to seek immediate medical attention."  *Id.* ¶¶ 42-43.

Plaintiff argues, without citation to authority, that the "mere fact that the [Syracuse Police Department] had no formal written policy [regarding the use of gas] causes an unconstitutional policy on the use of gas."  (Dkt. No. 43 at 10.)  In the absence of any authority for this proposition, the Court declines to find that the absence of a use-of-gas policy subjects the City to liability.

Plaintiff alleges that the City is liable because Defendant Miguel acted as a policymaker. A single act by a municipal policymaker can, in some circumstances, create liability for the municipality.  *Lathrop v. Onondaga C'nty*, 220 F. Supp. 2d 129, 136 (N.D.N.Y. 2002).  Here, however, even if one assumes that Defendant Miguel was a "municipal policymaker," he did not, as discussed above, violate Plaintiff's constitutional rights.  Therefore, the City cannot be held liable on the basis of Defendant Miguel's actions.

Plaintiff argues that the City is liable because it failed to train police officers adequately in the use of gas.  A local government entity's alleged failure to train its employees creates liability under § 1983 only "[i]n limited circumstances."  *Connick v. Thompson*, 131 S.Ct. 1350,

26

1359 (2011).  Indeed, a "municipality's culpability for a deprivation of rights is at its most

tenuous where a claim turns on a failure to train."  *Id*.  The "stringent standard" of deliberate

indifference applies to failure-to-train claims.  *Id*. at 1360.  In order to prevail, the plaintiff must

demonstrate that the municipality was "on actual or constructive notice that a particular omission

in [its] training program causes . . . employees to violate citizens' constitutional rights [and] the

policymakers chose to retain that program."  *Id*.  "A pattern of similar constitutional violations by

untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes

of failure to train."  *Id*.

Here, as discussed above, there is no evidence that any police officer committed a

constitutional violation by failing to provide medical care for Plaintiff.  Thus, there was no

constitutional violation in this instance, much less a "pattern of similar constitutional violations."

Moreover, Defendant Miguel testified at his deposition that he could not recall another incident

where the City used gas.  (Dkt. No. 40-12 at 13:2-16.)  Thus, there was no pattern of violations.

While it might have been reasonable or prudent for the City to train its officers to require gassed

civilians to receive medical treatment even in the absence of obvious signs of distress, it was not

constitutionally required.  Therefore, Plaintiff's claim that the City violated her constitutional

rights by failing to provide medical care is dismissed.

### C.    Claims Regarding the Contamination of Plaintiff's Belongings

Plaintiff alleges that she has suffered the "loss of her personal possessions in her

apartment" and claims that the City violated her constitutional rights because it "[f]ailed to

provide a protocol for removing and cleaning gas from the premises of property occupied by

innocent civilians." (Dkt. No. 23 ¶¶ 37, 39.)  The Court notes that Plaintiff's complaint does *not*

allege that the initial firing of gas into Plaintiff's home constituted a "seizure" of her property. Rather, it clearly alleges that the deprivation that Plaintiff complains of is the deprivation that occurred in the days, months, and years after March 17, 2007.

A claim against an individual defendant for the loss of Plaintiff's property would be analyzed as a Fourth Amendment seizure because the permanent loss of Plaintiff's property is a "meaningful interference with an individual's possessory interest in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The Fourth Amendment prohibits "unreasonable" seizures. *United States v. Amerson*, 483 F.3d 73, 77 (2d Cir. 2007). Reasonableness is generally a question of fact. *See McKelvie v. Cooper*, 190 F.3d 58 (2d Cir. 1999) (reversing magistrate judge's grant of summary judgment to officers on Fourth Amendment excessive force claim). Therefore, if Plaintiff had asserted her property claim against an individual, the Court would deny the motion for summary judgment and the matter would proceed to trial for a jury to determine whether the individual had acted reasonably.

Plaintiff's complaint, however, does not allege that any particular individual was responsible for the loss of Plaintiff's property. Rather, the complaint asserts that the City is responsible because it "[f]ailed to provide a protocol for removing and cleaning gas from the premises of property occupied by innocent civilians." (Dkt. No. 23 ¶ 39.) As discussed above, the City may only be held liable if it had an official policy or custom that caused Plaintiff to be subjected to a denial of a constitutional right. Plaintiff has not submitted any evidence raising a triable issue of fact that an official policy or lack of policy, a final decision by a municipal policymaker, a consistent or widespread practice, or a deliberately indifferent lack of training caused her to be deprived of her property. This distinguishes Plaintiff's case from *Spangler v.*

*Wenninger*, 388 F. App'x 507 (6th Cir. 2010), on which Plaintiff heavily relies.  (Dkt. No. 53.)

There, the Sheriff directly participated in the seizure of which the plaintiff complained.  Here,

although Plaintiff could have argued that the "seizure" of property to which she objected was the

initial firing of gas and that Defendant Miguel was a municipal policymaker who directed that

course of action, she did not do so.  Plaintiff's Second and Third Claims for Relief, in which she

sets forth her allegations regarding Defendant Miguel, do not mention Plaintiff's loss of property.

Rather, they refer to Plaintiff's "protected *liberty* interests."  (Dkt. No. 23 ¶¶ 41-48, emphasis

added.)  Plaintiff has not directed the Court to any evidence that Defendant Miguel had any role

in the subsequent failure to decontaminate Plaintiff's property or to the failure to allow her back

into her home to retrieve items.  The Court has a great deal of sympathy for Plaintiff, but

sympathy is not sufficient to create a constitutional claim.  Therefore, Defendants' motion for

summary judgment is granted.

Because the Court has dismissed all of Plaintiff's federal claims, it declines to exercise

jurisdiction over Plaintiff's state law claims.

**ACCORDINGLY**, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 40) is

**GRANTED**.

Dated: September 30, 2011
      Syracuse, New York
                            George H. Lowe
                            United States Magistrate Judge